JOB HAGGIN, Appellant, v. JOHN GARWOOD AND MARY E. GARWOOD, Defendants, MARTIN TURNEY, *et al.*, Interveners.

**Good Faith Buyer.** An old man engaged a woman as housekeeper for life, she to be supported and share his estate on his death. He delivered her a well secured note for eight hundred dollars as security for her services. She disposed of this note to a neighboring farmer to whom she owed forty dollars for which he was not pressing, and he paid her fifty dollars to go to New York with, and gave his note for the balance. He knew of the arrangement made with the housekeeper. He had little property except a slightly encumbered farm. *Held,* he was not a good faith purchaser without notice.

**Contract Construed.** Where a contract provides for arbitration if there be disagreement on what damages are due should employe leave without fault, it is intended that if she leaves through her own fault nothing shall be paid her, and hence no arbitration is to be had in that case.

*Appeal from Tama District Court.*—Hon. John R. Caldwell, Judge.

### Friday, January 24, 1896.

Action in equity to recover judgment against the defendants on one promissory note executed by them for eight hundred dollars, with interest at six per cent., payable to the order of Martin Turney one year after date, and dated April ——, 1893; also, for decree foreclosing a mortgage upon real estate executed by the defendants to secure the payment of said note. Said note was indorsed before maturity by Martin Turney to Emeline L. Conklin, "without recourse," and by Emeline L. Conklin in blank and delivered to the plaintiff. Defendants admitted liability on said note and mortgage, and, as the contentions are entirely between plaintiff and intervener Turney, nothing further need be said as to their answer, nor need the interveners other than Martin Turney be further noticed. Martin Turney filed his petition of intervention, embracing twenty-one paragraphs, the substance of which is as follows: He alleges that he was the owner of the note and mortgage in suit, together with certain real estate, and possessed of other notes belonging to the estate of his wife; that he was sixty-eight years of age, infirm mentally and physically, and much depressed on account of the recent death of his wife, and in a condition to be easily influenced by those who should obtain his confidence; that Emeline L. Conklin, knowing these facts, formed the purpose of fraudulently obtaining possession of the note in suit and said other property, and did request and persuade him to transfer said notes, and to deed said real estate to her, under the promise and pretense that she would care for and support him during his life; that by undue influence she did get control of his will, and did secure from him

the transfer to her of said property, aggregating four
thousand dollars in value; that she did, by fraud and
undue influence, induce him to enter into a written
contract with her, a copy of which is attached to the
petition; that by reason of said fraud and undue influ-
ence he did transfer all of said property, including the
note and mortgage in suit, to Emeline L. Conklin.  He
avers that it was agreed between them that the pro-
visions in said writing as to arbitration should apply
to both parties, and that by oversight and mistake
the scrivener failed to express said contract, but used
language which renders it doubtful whether intervener
would be entitled to arbitration if she wrongfully left
his service.  He avers that he at the time believed that
said Emeline L. Conklin was a woman of good char-
acter and standing, but that after said contract was
made she did not conduct herself as a virtuous and
respectable woman, in his house, after she secured
possession of his property, and said deed had been exe-
cuted and delivered to J. W. Willett to be held in
escrow.  Intervener further alleges that, after said
Emeline had obtained possession of said notes and
mortgages, she collected such notes as she was able
to collect, and the balance she disposed of and reduced
to money, and converted the whole amount thereof to
her own use, and absconded and left the state; that by
reason of said frauds and wrongs he became dissatis-
fied with said contract, and asked to have the same
canceled, and offered to pay said Emeline the reason-
able value of her services.  Intervener also avers "that
said plaintiff took said note and mortgage, as described
in the petition, with notice of all the wrongs afore-
said by which the same were obtained from intervener."
Intervener prays that said note and mortgage may be
decreed to be his property, that plaintiff be restrained
from collecting the same, and that he have a judgment
against the defendant John Garwood for the amount.

·due upon said note, and a decree foreclosing said mortgage. Plaintiff, in answer to the petition of intervention, says "that on January 31, 1894, and for a long time prior to that date, he was the *bona fide* holder and owner of said note and mortgage, bought in regular course of business, without knowledge of any of the claimed frauds set forth in said intervening petition." He expressly denies that he took said note and mortgage with knowledge of the wrongs and frauds which it is claimed Emeline L. Conklin practiced upon intervener. The case was tried to the court, and decree declaring Martin Turney, intervener, to be the owner of the note and mortgage sued upon; that the same were obtained from him by fraud, as alleged in his petition; that the averments of his petition are true,— and rendering judgment and decree of foreclosure thereon against the defendants, and in favor of Martin Turney. Plaintiff appeals.—*Affirmed.*

*Meeker & Meeker* for appellant.

*Struble & Stiger* for appellees.

Given, J.—I. On July 20, 1893, "Martin Turney, widower, party of the first part, and Emeline L. Conklin, spinster, party of the second part," entered into a lengthy agreement in writing, in substance as follows: It recites that Martin Turney is sixty-eight years of age, infirm in body, and liable to become an invalid requiring the care of a housekeeper and nurse; that he has no one whose duty it is to care for him, and, being desirous that he be properly maintained and cared for during his life, agreed with the party of the second part as follows: That she should enter his home, then being built, when completed, "and shall thereafter continue to work for and serve said first party as his housekeeper and nurse, and shall

well and sufficiently support, maintain, and clothe, and in all respects suitably care and provide for, said first party, at his own expense, in the home aforesaid, including his necessary medical attendance and nursing during life, and at his decease shall give him Christian burial in cemetery lot in Toledo where his deceased wife is interred. Then, at the decease of first party, second party shall have and receive, as her full compensation and consideration for such services, the entire remainder of the estate of first party, real, personal, and mixed, after paying all just charges against the same, including expenses of his last illness and burial. And the second party hereby agrees to enter the service of the first party, at his home, in Tama, Iowa, in manner and form aforesaid, and continue to serve as his housekeeper and nurse so long as he shall live, at the consideration herein named, and in every respect perform the full duties required by this agreement." It is then agreed that the estate of Mr. Turney consists of about two thousand dollars in moneys and credits, the legal title to two lots in Tama City, and life estate and equitable fee title to two other lots in Toledo, as to which last two lots Turney was to take legal measures to establish his title thereto; that first party was to make deeds for said lots to second party, "in order that second party may be better secured for her services," the deeds to be delivered in escrow with James Willett, "to be surrendered to second party at the decease of first party, or sooner if the title of the first party shall have been fully determined and fixed by legal proceedings in said Toledo property, unless second party shall have left the employment of first party as hereinafter stated." It also provided that, if the deeds were delivered before decease of first party, second party was to give back a mortgage to secure performance of the contract on her part. It is further

provided that, while in the service of first party, second party was to receive from first party support, food, clothing, and necessary medical attendance for herself and her daughter, Vivian, who was to be one of the family. It is also provided that if the parties become dissatisfied, "and the party of the second part withdraw from the services of the party of the first part without her fault, then and in that event she shall be entitled to receive from the first party, or from his estate, a reasonable compensation for the services then rendered under this agreement, comparing the time of such services and the character thereof with the whole time, as per expectancy of life;" also, if the parties failed to agree as to the amount, that it should be determined by arbitrators; that if second party shall die, or by unavoidable accident become disqualified from continuing in the services of first party, then she or her legal heirs shall be entitled to receive reasonable compensation for the services rendered. This agreement concludes as follows: "The parties hereto, with the daughter, Vivian, constituting the family herein arranged for, shall each exercise reasonable economy in living expenses, and, so far as practicable, shall pay their living and current expenses, including taxes, etc., out of the use, income, and interest derived from the property hereinbefore enumerated; and the principal of said property, real and personal, shall not be encroached upon to pay such expenses, except in cases of actual necessity." We may say here that we discover nothing doubtful in the language of this contract, with respect to arbitration. It provides for compensation to Emeline L. Conklin if she quit the service of Mr. Turney "without her fault," and that, in case of disagreement as to the amount, it shall be determined by arbitrators. The contract is silent as to what shall follow if she quits the service because of her fault. We think, from this

silence, that the understanding must have been that in that case she was to have no compensation, and consequently there would be no necessity for arbitration.

II. By this contract, Emeline was to receive support for herself and daughter during the life of Mr. Turney, and at his death she was to receive, as full compensation, whatever remained of his estate unexpended for their mutual support, after the payment of the debts. There is no provision that the notes should be transferred to Emeline, but, as a security to her, the deeds were to be executed and delivered as provided. Notwithstanding these provisions, Mr. Turney, did on the day the contract was executed, or soon thereafter assign and deliver the note and mortgage in suit, and the other notes to Emeline. On July thirtieth following, he executed deeds to her for the lots, and deposited them in escrow. Appellant's house being completed, Emeline commenced services as his housekeeper about the middle of September, 1893. In October or November, following, appellant, learning that she was disposing of some of the notes, became dissatisfied. Another cause of dissatisfaction was his discovering that she was unduly, if not criminally, intimate with a young man whom they had taken to board and lodge. Mr. Turney complained to her of her conduct, and proposed to her that they settle, at which she became displeased, and declared that "she had come there to stay, and was going to stay." The result of these disagreements was that on February 21, 1894, having assaulted the old gentleman with a case knife, she quit his service.

III. The only evidence as to Mr. Turney's mental condition at the time the negotiations were being had and the contract was executed, is what may be inferred from the nature of the transaction, and his manner of testifying. Neither of these justifies the inference that he was incapacitated to transact business, but both

show that he was quite feeble in mind, overconfident, and easily persuaded by those in whom he had confidence. It does appear that at the time he reposed an especial confidence in Emeline L. Conklin, and was exceedingly desirous to have her as his housekeeper. It does not appear that she solicited the employment, but, on the contrary, that it was Mr. Turney who urged the making of the contract at different times during the two months or more preceding its execution. Evidently, it was not because of any obligation assumed in the contract that he assigned the notes to Miss Conklin, but it was, we think, because he was so pleased over her accepting the service, and of a desire that she might feel fully secured. We regard it as doubtful, under the evidence, whether Miss Conklin procured the assignment and delivery of the notes to her by fraud or undue influence, but it is manifest from the agreement, and from what was said at the time, that she received them understanding that she had no right to sell or otherwise dispose of them. Let it be conceded that she did not then have any intention of disposing of the notes, yet it appears beyond question that when dissatisfaction arose, and it became apparent that she was not likely to remain long in Mr. Turney's service, she determined to dispose of the notes, and placed them beyond his reach. To dispose of them as she did was a clear violation of the contract, of the understanding by which she received them, and a fraud upon Mr. Turney, for which, as between him and her, a court of equity would grant him relief. After but a brief service, and after it had become apparent to her that, because of her own immoral conduct, the services would not be long continued, she sold these notes, to which she had no just right, realizing therefrom a sum greatly in excess of the value of the services rendered. We say again that this was a

fraud upon Mr. Turney, for which as to her, he is entitled to relief.

IV.   We next inquire whether plaintiff received the note in suit with knowledge of the fraudulent purpose of Emeline L. Conklin.   Plaintiff testifies, "I did not know there was any difficulty between Mr. Turney and Miss Conklin, or that there was any claim or pretense that she had no right to this note." We think the facts and circumstances do not sustain the plaintiff in this statement.   He had resided for many years on the farm near Liscomb, in Marshall county, some thirty miles from Tama City, and had become acquainted with Emeline and with her uncle R. W. Smith, while they were residents in his neighborhood.   After Smith moved near to Tama City the plaintiff and his wife occasionally exchanged visits with the Smith family.   On Christmas day, 1893, he and his wife visited Smith, and, with them and others, took dinner with Mr. Turney, Miss Conklin presiding as housekeeper.   On January seventeenth, following, he was again at Smith's, and on that day Emeline, without any previous arrangement, it is claimed, came to Mr. Smith's, having with her the note and mortgage in suit, and then and there assigned the note in blank, and delivered it and the mortgage to the plaintiff.   Plaintiff states the transaction as follows: "The next time I saw her was at Mr. Smith's, on the 17th day of January, 1894, I was down there on a visit.   I purchased the note of Emeline Conklin on that day, about 10 o'clock, I think.   It was a note for $800 against Mr. Garwood.   I bought it because she owed me some, and she wanted to sell it to me.   We got to talking about it, and I bought it.   She said she wanted some money to go to New York state with.   I told her I would give her $790 for the note.   She owed me $40.   Paid her $50 in money.   She indorsed the note at the time.   She and Mr. Smith both said it was

the first mortgage on the place. They showed what place it was. The place was designated as the 'Old Turney Place,' but I did not go over there. She said it was a first mortgage. They said the buildings on it were good ones. I gave my note, drawing six per cent. interest, due in six months, or July 17, 1894. She wrote the note out herself and then read it over to me. It read 'Pay Emeline L. Conklin or order.'" He knew that previous to that time Mr. Turney had sold his place, near to where Mr. Smith lived, to the defendant Garwood, and that this note and mortgage were to Mr. Turney for purchase money. He also knew that Emeline L. Conklin was not a woman of means; that she was working for wages to support herself and child, and was not able to acquire a note such as this by her ordinary earnings. He had learned during the Christmas visit the arrangement that Emeline was to serve as housekeeper for Mr. Turney during his life, and that she was to have therefor support for herself and child during his life, and whatever property he might die seized of. With knowledge of these facts, it must have occurred as strange to plaintiff that Emeline should have such a note; that she should have brought it with her, to sell to him, without any previous arrangement; and that, being employed as she was, she should want money to go to New York state with. It must have occurred to him as somewhat strange that Emeline ever thought of offering to sell the note to him, as his business was not the purchasing of notes, but that of farming. He states, however, that he had occasionally bought notes. The transaction itself must have suggested to him that Emeline had some sinister purpose in it. She sold to him a promissory note for eight hundred dollars, due in April, 1894, with six per cent. interest, with about nine months' accrued interest, amply secured by first mortgage, and took in return credit for forty dollars

indebtedness, fifty dollars in cash, and his unsecured note for seven hundred dollars, due July 17, 1894, with 6 per cent. interest. He was not pressing payment of the forty dollars, and it must have occurred to him that there was some urgent reason why she should be willing to sell the note upon such terms. True, plaintiff owned his home in Liscomb, worth, he says, one thousand five hundred dollars, and one hundred and seventy-six acres of land near Liscomb, worth fifty dollars per acre, upon which there was an incumbrance of one thousand dollars. However good plaintiff's credit may have been, it was surely not equal to the first mortgage security upon ample property; and it is unusual, at least, that he should be putting his money into the purchase of notes while one thousand dollars incumbrance lay upon his farm. The fact that Emeline wanted money to go to New York state indicates quite strongly, we think, that plaintiff knew of her purpose to quit the service of intervener; and, knowing the brief time she had been in his service, he must have known that she had not earned the note in suit. We will not discuss the facts further, but say that, from the record before us, we are satisfied that Emeline L. Conklin, in making the sale of the note in suit, did so with intent to defraud the intervener, Martin Turney, and that the plaintiff purchased said note with knowledge of her fraudulent purpose. It follows from this conclusion that the judgment of the district court must be *affirmed*.